**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| DALE IHNKEN | : | |
| | : | |
| | : | |
| v. | : | CCB-11-3508 |
| | : | |
| | : | |
| JAN GARDNER, *et al.* | : | |

**MEMORANDUM**

Plaintiff Dale Ihnken was a concert promoter who organized a festival in Frederick County, Maryland, that was to be held Thursday to Sunday, June 18-21, 2009. Shortly after noon on Friday, June 19, however, after the festival had caused reported noise disturbances well into the previous night, county officials ordered the immediate closure and cancellation of the festival, evicting festivalgoers, vendors, presenters, and musical acts by 3:00 PM. Mr. Ihnken alleges the county's decision resulted in significant financial loss, irreparable harm to his business, and the end of his career as a promoter. He has brought a variety of constitutional and state law claims against the Frederick Board of County Commissioners, sheriff, and zoning administrators in their individual and official capacities. The defendants have moved to dismiss Ihnken's complaint or, in the alternative, for summary judgment. For the reasons set forth below, the defendants' motion will be granted in part and denied in part.

**BACKGROUND**

Ihnken first produced a two-day art and music festival in Baltimore called the Winter Solstice PROJEKT in December 2008. He states that he earned $55,000 in profit from the event and sought to partner again with the event's apparent main attraction, a "live" painter named Alex Grey. Ihnken subsequently produced festivals featuring Grey in San Francisco and

Knoxville in April and May 2009 that were, according to Ihnken, "very successful." (Pl.'s Opp., ECF No. 15, at 5). During 2009, Ihnken also planned the Summer Solstice PROJEKT (the "festival") which was to be a three-day event in Frederick County, Maryland (the "county"), that, like the previous ones, combined camping, art, and music. The festival was to be held from Thursday to Sunday, June 18-21.

Ihnken contracted with Erin Aylor, the owner of a 91-acre farm in Frederick, to lease the land for the festival. (Pl.'s Opp., Ex. 2 ("Contract"), ECF No. 15-2). Ihnken's contract with Aylor provided that Aylor, as "host," would acquire the necessary land use permits for the festival, but that Ihnken, as "producer," would pay Aylor $6,000 for use of the land and would "cover all permitting costs associated with the event." (*Id.*). Ihnken apparently was successful in marketing the event, as a Frederick newspaper article from June 11, 2009, indicated that hundreds of people were expected to attend for some or all of the three-day event, that festival-goers could camp for all three nights, and that over a dozen musical acts were slated to perform. (Pl.'s Opp., Ex. 7 ("Frederick News-Post"), ECF No. 15-7).

Aylor, however, appears to have been less than completely forthcoming in obtaining the appropriate permit or permits for the event. An e-mail sent from Aylor to defendant county commissioner Kai Hagan seeking assistance in obtaining final approval, because of reservations defendant zoning administrator Larry Smith had about the event, appears to suggest, misleadingly, that the festival was going to be mostly an educational gathering for individuals interested in topics like "biodiesel" and "self-sustainability." (Pl.'s Opp., Ex. 6 ("County E-mails"), ECF No. 15-6, at 6).[1] The e-mail suggests that musical acts would be only an incidental

---

[1] Exhibit 6 of Ihnken's opposition memorandum is a series of e-mails. Because the pages of the exhibit are not numbered, the court will assign page numbers, counting the cover page (which contains only the heading "Exhibit 6") as page 1.

element of the festival, when they were in fact a more central component, and that there would

only be a "couple" of acts, when more than a dozen were scheduled. (*Id.*). Furthermore, a letter

sent to Aylor by a zoning official during the approval process specifically indicated that the

festival would *not* be considered an "outdoor music festival" under COMAR, (Pl.'s Opp., Ex. 3

("Approval Letter"), ECF No. 15-3, at 1), so it is not clear what other representations Aylor

made to county officials to obtain the permit without the conditions mandated by COMAR for

such a festival. And, while both Ihnken and Aylor's contract and the newspaper article about the

event indicated that beer and wine would be served, (ECF Nos. 15-2 & 15-7), Aylor apparently

never obtained a permit to sell alcohol, though the vendors at the event were licensed to sell

alcohol under Maryland state law. (*See* Defs.' Mem., Ex. B ("Police Report"), ECF No. 12-4, at

8). Neither party has adduced any specific evidence indicating what materials and

representations the county relied on in its approval of the festival permit, but the court can infer

that Aylor was not entirely frank in his description of the event to the county.

       Nevertheless, despite the county's insistence that the permit, "by its terms," did not allow

music performances outside the hours of 8:00 AM to 5:00 PM, and that nighttime festivities were

not sanctioned, the permit itself is ambiguous. The permit characterizes the planned event as a

"festival" with "arts & crafts[,] music[,] and demonstrations." (Defs.' Mem., Ex. A ("Permit"),

ECF No. 12-2, at 1). The permit indicates that the "beginning" and "ending" dates of the event

were to be June 18 at 8:00 AM to June 21 at 5:00 *AM*, (*id.* at 2), which would align perfectly

with Ihnken's representations to the court and to the Frederick newspaper that the event would

run from Thursday through Saturday *night*, ending the early *morning* of Sunday, June 21.

       "Comments" from March 13, 2009, attached to the permit, however, appear to state that

the festival would run between the hours of 8:00 AM and 5:00 *PM* on Thursday, Friday,

Saturday, *and* Sunday. (*Id.* at 4). But another attached comment, dated April 9, 2009, states that "overnight camping has not been a temp[orary] use normally covered by this type of permit" and seeks additional information from Aylor. (*Id.* at 6). This indicates that Aylor had informed the county the festival would indeed run through the night, possibly *after* he received the first set of comments stating an end time of 5:00 PM. These comments also appear to reflect an ongoing discussion *about* the event, not necessarily conditions *on* the event. This is further illustrated by attached comments dated May 28, 2009, that state the use of campsites on the property had been approved. (*Id.* at 6-7). This approval is incompatible with the county's assertion that the temporary land use permit "unequivocally" applied only to activities between 8:00AM and 5:00 PM. It is plausible that the 5:00 "AM" indicated on the face of the permit was a mistake. But, even if it was, the permit explicitly allowed camping, an activity that ordinarily occurs after 5:00 PM and before 8:00 AM.

The county argues that the 5:00 AM time on the face of the permit is consistent with the overall schedule of the festival, and that the "8:00 AM to 5:00 PM" in the permit's comments is a condition on when music and demonstrations could be held at the festival. This is a reasonable—but hardly the only plausible—reading of the permit, given that the "comments" seem to be a running record of correspondence from the county regarding the permit, not a set of conditions. In addition, the Frederick newspaper article published a week before the event indicates that Ihnken was not being surreptitious about the nature of the event as a music and camping festival. (*See* ECF No. 15-7). The newspaper article also references several public websites that apparently contained more details about the event, although the contents of those sites are unknown to the court. So, the county would likely have had notice that the festival was being advertised as a day *and* night affair. In short, the permit itself is ambiguous, and although

Aylor may not have provided a full and frank description of the event during the application

process, the permit indicates that the county was aware that at least one part of the festival would

continue through the night.

On the first night of the event, Thursday to Friday morning, June 18-19, Ihnken

scheduled musical acts through the night. The county police received multiple complaints about

noise. When officers confronted Aylor and Ihnken about it, they objected to having to turn down

or end the music, relying on the permit. (Police Report, ECF No. 12-4, at 3). The police advised

Ihnken that "music events could go as late as midnight by county ordinance" and that the music

needed to end by midnight. (*Id.*). Ihnken objected to this and asserted that the permit allowed

him to play music all night. (*Id.*) After further statements by the police that he might also be

breaking the law by "disturbing the peace," Ihnken indicated he would "try to get the music off

at 3:00 – 3:30 AM," and the police appeared to  consent to that, advising him that the volume

needed to be lowered and that the music "needed to end at 3:00 AM." (*Id.* at 4-5). The officers

warned Ihnken, however, that further noise complaints would result in their returning to the

scene to shut the event down. (*Id.* at 5). Ihnken asked whether they had the power to do that, and

the officer told him they needed to examine the permit. (*Id.*). The officers left the scene with an

intent to check the festival's permits in the morning. (*Id.*). The police continued to receive

complaints until 3:00 AM, when Ihnken told an officer by phone that he was stopping the music.

(*Id.*).

The next morning, the county board of commissioners received an angry e-mail from a

constituent regarding the noise, and the commissioners became aware of the police activity and

complaints the night before. (County E-mails, ECF No. 15-6, at 2-3).  During that morning,

defendant sheriff Charles Jenkins met with county zoning officials, and, at some point on the

5

morning of Friday, June 19, the zoning administrator, defendant Larry Smith, along with the sheriff and other county officials, and with the subsequent endorsement of defendant county commissioners, made the decision to revoke the land use permit and immediately evict all festival-goers from Aylor's property. (*Id.* at 7-8, 11-15). The county and county officials apparently based the decision to cancel the festival abruptly on the grounds that the previous night's music was a violation of the permit and that this provided legal authority to clear Aylor's land of the festival. The e-mail exhibits attached to Ihnken's opposition memorandum also demonstrate that county officials had reservations about the festival before the permit was approved. (*Id.*). One defendant county commissioner also celebrated the shutdown of the festival with an e-mail stating "Humanity 1 – Birkenstock wearin' tree-huggers 0." (*Id.* at 7).

As a result, Ihnken was forced to forfeit the costs of the festival, including the rent he paid Aylor for the space. Ihnken had plans to hold a festival in Toronto in August 2009, and another Winter Solstice PROJEKT in Baltimore in December 2009, but he states that as a result of the cancellation his reputation was ruined and talent, including the featured "live artist" at these events, Alex Grey, refused to work with him. Thus, the county's decision apparently cost him thousands of dollars in profits and his career as a festival promoter. Ihnken subsequently filed this claim under § 1983 and Maryland law alleging that the county's actions violated the First, Fifth, and Fourteenth Amendments and Articles 24 and 40 of Maryland's Declaration of Rights. Ihnken also brings a number of state tort claims.

## ANALYSIS

### I.      Standard of Review

The defendants have moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A court considers

only the pleadings when deciding a Rule 12(b)(6) motion. Where the parties present matters

outside of the pleadings and the court considers those matters, as here, the motion is treated as

one for summary judgment. *See* Fed. R. Civ. P. 12(b); *Gadsby by Gadsby v. Grasmick,* 109 F.3d

940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.,* 241 F.Supp.2d 551,

556 (D. Md. 2003). The parties, however, "shall be given reasonable opportunity to present all

material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b). The requirement of

"reasonable opportunity" means that all parties must be provided with notice that a Rule 12(b)(6)

motion may be treated as a motion for summary judgment, which can be satisfied when a party is

"aware that material outside the pleadings is before the court." *Gay v. Wall,* 761 F.2d 175, 177

(4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.,* 149 F.3d 253, 261 (4th

Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious").

Ihnken had notice that the defendants' motion might be treated as one for summary

judgment. The motion's alternative caption and attached materials are in themselves sufficient

indicia. *See Laughlin*, 149 F.3d at 260-61. Moreover, Ihnken referred to the motion in his

opposition brief as one for summary judgment and submitted additional documentary exhibits.

Therefore, the court will consider the affidavits and additional materials submitted by the parties

and will treat the motion of the defendants as a motion for summary judgment.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified

that this does not mean that any factual dispute will defeat the motion. "By its very terms, this

standard provides that the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

Ihnken has filed suit against the county commissioners, sheriff, and zoning officials who were in office at the time of the festival in both their individual and official capacities. The claims against the officers in their official capacities will be assessed collectively as claims against the county. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). The court will separately assess the validity of Ihnken's claims against the officials in their individual capacities.

I.       **§ 1983 Claims (and Related Maryland Constitutional Claims)**

Ihnken alleges that the shutdown of the festival violated his constitutional rights under the First, Fifth, and Fourteenth Amendments. To state a claim under 42 U.S.C. § 1983, "a plaintiff must establish (1) that the defendant deprived him of a right secured by the Constitution or laws of the United States and (2) that such deprivation was committed by a person acting under color of state law." *See, e.g.*, *Bennett v. Monette*, 507 F. Supp. 2d 514, 517 (E.D.N.C. 2007) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). County governments and their officials are persons acting under color of state law and subject to suit under § 1983. *See, e.g.*, *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Thus, if the shutdown was a deprivation of Ihnken's constitutional rights, any county official involved in the shutdown may be liable, unless they are entitled to qualified immunity. *Id.* at 783.

Furthermore, the county itself (and not just its officers in their individual capacities) may be held liable under § 1983 where "the execution of a policy or custom of the [county] caused the violation." *Id.* at 782. A "single decision by municipal policymakers" can lead to such liability where "the decisionmaker . . . possess[es] 'final authority to establish municipal policy with respect to the action ordered.'" *Id.* (quoting *Pembaur v. City of Cincinnatti*, 475 U.S. 469, 480 (1986)). Assuming that the shutdown was a violation of one or more of Ihnken's constitutional rights, there are two independent grounds for holding the county itself liable for that decision. First, the record indicates that defendant zoning administrator Smith made the final decision to end the event and evict the festivalgoers, (*see* ECF No. 15-6 at 2), and Frederick County zoning ordinance § 1-19-2.100 appears to grant the zoning administrator final authority over land use permits. (*See* Defs.' Reply, Ex. E ("Zoning Ordinance"), ECF No. 20-5); *see also Vodak v. City of Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (holding that because the city

council delegated final authority to police superintendent to make policy regarding demonstrations, in wrongful arrests claim, "the superintendent *was* the City, so far as the demonstration and arrests were concerned").  Second, even if the Frederick Board of County Commissioners had not delegated complete and final policymaking authority to the zoning administrator with respect to the festival's land use permit, the e-mails in the record demonstrate that the commissioners were involved in the controversy surrounding the festival and expressly approved of the decision to shut it down well before the final eviction was complete. (*See* County E-mails, ECF No. 15-6). So, the board "was aware of the [alleged] constitutional violation" and both "participated in" *and* "condoned it." *See Love-Lane*, 355 F.3d at 782-83 (quoting *Pembaur*, 475 U.S. at 480).

Thus, in addition to any individual defendant who facilitated the shutdown and who is not entitled to qualified immunity, the county itself can be held liable if the shutdown was a deprivation of one or more of Ihnken's constitutional rights, as evaluated with respect to each alleged deprivation below.

### a.  Procedural Due Process (Counts III & X)[2]

In order to succeed on his procedural due process claim, Ihnken must show that (1) he had a property interest; (2) of which he was deprived by the county; (3) without due process of law. *See Tri County Paving, Inc. v. Ashe County*, 281 F.3d 430, 436 (4th Cir. 2002). "It is well-settled that the Fourteenth Amendment itself does not create property interests. 'Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an

---

[2] Counts III and X of Ihnken's complaint are identical because Article 24 (Maryland's due process provision) and the Fourteenth Amendment have been construed identically except where the Maryland Court of Appeals has expressly stated that Article 24 is broader. *See Ross v. Cecil County Dep't of Soc. Serv.*, 878 F. Supp. 2d 606, 622 (D. Md. 2012) (citing *Koshko v. Haining*, 921 A.2d 171, 194 n.22 (Md. 2007)). There is no indication that Article 24 affords more protection than the Fourteenth Amendment on the claims presented in this suit.

independent source such as state law.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Generally, a deprivation of a property interest must "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.* (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "To determine whether a procedural due process violation has occurred, courts must consult the entire panoply of predeprivation and postdeprivation process provided by the state." *Tri County Paving*, 281 F.3d at 436 (quotation omitted). "[A]bsent the necessity of quick action by the State or the impracticality of providing any predeprivation process, a post-deprivation hearing [is] constitutionally inadequate." *Presley v. City of Charlottesville*, 464 F.3d 480, 489 (4th Cir. 2006) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982)). However, the process due in cases "involving regulation of land use through general police powers . . . are not extensive." *Id.* Nevertheless, the summary revocation of a license or permit without adequate notice, pre-, or post-deprivation procedures is a violation of the Fourteenth Amendment where the plaintiff had a property interest in the permit. *See, e.g.*, *Barry v. Barchi*, 443 U.S. 55, 66 (1979) ("[E]ven a temporary suspension can be severe; and we have held that the opportunity to be heard must be 'at a meaningful time and in a meaningful manner.'") (citation omitted); *Int'l Ground Trans. v. Mayor & City Council of Ocean City, Md.*, 475 F.3d 214, 215-222 (4th Cir. 2007); *Tri County Indus., Inc. v. Dist. Of Columbia*, 104 F.3d 455, 460-62 (D.C. Cir. 1997).

The county rests its opposition to Ihnken's procedural due process claim almost entirely on the proposition that he had no property interest in the land use permit for the festival because it was filed by Aylor, the owner of the venue, and only Aylor's name appears on the permit. But, "[p]roperty interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. . . . To have a property interest in a benefit, a person clearly must .

. . have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 571-72, 577. Here, the court agrees with Ihnken's relatively straightforward assertion that he had a property interest in the permit and use of the farm "by way of his contract with Erin Aylor." (Pl.'s Opp. at 22). The contract Ihnken signed with Aylor granted him exclusive use of Aylor's land for the entire duration of the festival and it provided that Ihnken, as the producer of the festival, would, among other duties, acquire insurance for the event, remove all trash from the land after the event, and "cover all permitting costs associated with the event." (ECF No. 15-2). The revocation of the permit obviously caused Ihnken significant financial harm, and there is no indication that he recovered the $6,000 he paid Aylor for use of the land, or, obviously, the cost of the permit. The county does not argue that, once they are issued, county zoning permits are revocable at-will. *See Richardson v. Town of Eastover*, 922 F.2d 1152, 1156-57 (4th Cir. 1991) (benefits that "can be suspended or revoked only upon a showing of cause" create a protected property interest). Thus, Ihnken paid for the permit, he suffered a substantial actual injury from its revocation, and he was *entitled*, as a lessee by contract, to all of the land use rights permitted by it. The mere fact that Aylor technically acquired the land use permit does not mitigate Ihnken's contractual entitlement to the permit's benefits, including the profits earned by holding the festival. *Cf. Romanello v. Maguire*, 404 A.2d 833, 836 (R.I. 1979) (holding that plaintiffs had standing to pursue suit against a county for denial of a festival license even though the license application was submitted by a third-party). Accordingly, Ihnken was deprived of a property interest by the county's revocation of the land use permit, and the validity of his claim turns on whether the county afforded him due process in the revocation decision.

"Although due process generally requires an opportunity to be heard prior to the deprivation of a property interest . . . [w]here 'a State must act quickly, or where it would be

impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause.'" *Bennett*, 507 F. Supp. 2d at 517. From the present record, it does not appear that Ihnken (or anyone else) was afforded notice and a predeprivation hearing before the county ordered the festival off of Aylor's farm. In its memoranda, the county does not suggest that any such process was afforded. Instead, the county advances two legal bases for the summary revocation of the permit and the eviction. First, the county argues that it was authorized to evict the festival on Friday, June 19, because the festival had violated the Frederick County noise ordinance, § 1-11-6 of the Frederick County Code (Defs.' Mem., Ex. C ("Noise Ordinance"), ECF No. 12-6), during the previous night and into very early Friday morning. Second, and relatedly, the county relies on § 1-19-2.110(G) of the Frederick County zoning ordinance, (ECF No. 20-5 at 4), which states that "[a] zoning certificate and building permit is revocable upon noncompliance with any conditions or requirements imposed under this chapter." The county argues that this authorized the zoning administrator to order the eviction because music was played at the festival outside of the 8:00 AM to 5:00PM window allowed under the county's interpretation of the permit. The county has not demonstrated it is entitled to summary judgment under either of these theories.

First, the county suggests that this case is analogous to *Bennett*, where the court found no procedural due process violation based on a sheriff's decision to abruptly end a concert because of the "noise level and profanity" coming from the concert. 507 F. Supp. 2d at 516, 518-19. The county's reliance on *Bennett* is misplaced. There, the sheriff was unequivocally acting under express authority granted to him in a municipal noise ordinance: he entered the premises during the alleged violation of the ordinance and ordered the shutdown of the concert to abate that *ongoing* violation. *Id.* Here, while it is likely that Ihnken's festival was violating the county's

noise ordinance during the first night, it is uncontested that the festival was evicted while no

violation was occurring. The county has attached a thoroughly prepared police report that

documents multiple complaints regarding noise well into the night of June 18 and the police

department's efforts to abate that noise. (ECF No. 12-4). What that report also shows, however,

is that Ihnken successfully negotiated with the officers who confronted him regarding the noise,

at least insofar as they appear to have agreed to let him play music until 3:00AM, unless they

received "a lot more calls." (*Id.* at 5). There is also evidence in the record that Ihnken did indeed

end the music that night at 3:00AM. (*Id.*). The county likely could have exercised its inherent

police powers to abate an ongoing threat to the public welfare, such as a violation of the noise

ordinance, and ended the music as its officers deemed appropriate, but the police exercised

discretion not to do so.

In the absence of any ongoing violation, the Frederick County noise ordinance provides

no express authority to preemptively enter private property, cancel public events, or take other

such action. The ordinance itself provides only that violators of it will be guilty of a

misdemeanor and subject to fines of "no more than $500" and imprisonment "for not more than

10 days in jail for each offense." (Noise Ordinance, ECF No. 12-6, at 4). The ordinance even

contemplates multiple-day violations: "each day a violation exists shall be a separate offense."

(*Id.*).  So, while the county may have had the authority to issue a criminal citation to Ihnken and

other responsible parties for an earlier noise violation, it is unlikely that the ordinance can be

construed to authorize the summary eviction of a festival from private property when no

violation is occurring, particularly without any procedural safeguards or judicial intervention.

Second, the county argues that because the Frederick County zoning ordinance § 1-19-

2.110(G) authorizes the zoning administrator to revoke a zoning certificate and building permit

14

"upon noncompliance with any conditions or requirements imposed" by the zoning ordinance, the county correctly revoked the festival's temporary use permit based on the festival's alleged "noncompliance" with the operating times stated in the permit. (Zoning Ordinance, ECF No. 20-5, at 4).[3] While this may have been sufficient *legal* authority under which the permit could have been revoked, this argument says nothing about the *process* by which that authority can be constitutionally exercised. Even assuming that the permit definitively limited the festival to the alleged hours of 8:00AM to 5:00PM, which is a disputed fact given the noted ambiguity of the permit, the zoning administrator's alleged authority to revoke the temporary use permit does not diminish the county's responsibility to provide adequate procedural safeguards for such a revocation. It is possible that Ihnken was afforded a "meaningful" hearing on the morning of June 19. As discussed above, the process due is dependent upon the specific circumstances of a deprivation. But the present record contains virtually no evidence regarding the process by which the revocation decision was made nor the contents of the conversations Ihnken may have had with county officials that morning.

In its memoranda, the county offers no description of any pre- or post- deprivation process that Ihnken was afforded or that he could have pursued but did not. The Frederick County zoning ordinance itself indicates that the zoning administrator, Board of County Commissioners, zoning officials, and other county officials, if they seek to "prevent or abate a violation" of the zoning ordinance, should issue a citation and fine (which entitles the alleged violator to a trial), bring criminal charges, or "take appropriate legal action . . . including seeking

---

[3] It is not apparent that the revocation provision of § 1-19-2.110(G), which governs zoning certificates and building permits issued "to change the use, locate or to begin the new use, erection, construction, reconstruction, extension, conversion or structural alteration or development of any lot or structure . . . ," § 1-19-2.110(A), applies to "temporary use permit[s]," including the festival permit, issued under § 1-19-8.700. (*See* Zoning Ordinance, ECF No. 20-5, at 3-4; Defs.' Reply, Ex. D ("Temporary Use Ordinance"), ECF No. 20-4).

an injunction, mandamus, abatement, or other appropriate legal remedies." §§ 1-19-2.210, -2.220; -2.230 (ECF No. 20-5 at 8-10). The zoning ordinance provides no summary process for county officials to follow in responding to alleged permit violations.

Even though the Frederick County zoning administrators decided that Maryland's state regulations governing "health permits for outdoor music festivals," COMAR 10.16.05.01 *et seq.*, did not apply to the festival (perhaps because Aylor's permit application was misleading), the regulations themselves are illustrative. COMAR 10.16.05.14 provides that, in the event a health officer believes a provision of the festival regulations is being violated, the officer may "seek an injunction," as well as "[s]uspend or revoke the health permit." But, importantly, unless "the public health, safety, or welfare imperatively requires emergency action," COMAR 10.16.05.14(B)(2), a health officer may not "take[] final action against the applicant or permit holder" until the permit holder has "an opportunity for a hearing" under the Maryland Administrative Procedure Act. COMAR 10.16.05.15(A). Even permits that are summarily revoked in an emergency are entitled to a post-"final action" hearing. *See* COMAR 10.16.05.15(B). Thus, while these provisions did not apply to the festival, they do suggest that the actions taken by the county—summarily revoking the permit and simultaneously evicting the festival where there was no emergency—were not compliant with any established procedure for analogous situations under state law, let alone the procedural requirements of the Constitution. Under similar circumstances, where officials have taken summary action, particularly where such action had a significant and immediate impact on the plaintiff, courts have found that the Fourteenth Amendment was violated. *See, e.g.*, *Tri County Indus.*, 104 F.3d at 461-62; *Holman v. City of Warrenton*, 242 F. Supp. 2d 791, 806-08 (D. Or. 2002); *T. Weston, Inc. v. Mineral*

*County, W. Va.*, 2008 WL 3474146, at *12-13 (N.D. W.Va. Aug. 12, 2008);[4] *cf. Helton v. Hunt*, 330 F.3d 242, 247-48 (4th Cir. 2003) (statute authorizing the summary destruction of gaming machines violated due process). Here, the county's decision appears to have been, on the present record, abrupt, and it provided no opportunity for a challenge by Ihnken before it caused him financial damage and irreparable harm to his livelihood. Thus, the defendants have not demonstrated that they are entitled to summary judgment on Ihnken's procedural due process claim.

Furthermore, although the individual defendants argue that they are entitled to qualified immunity on this and all of Ihnken's § 1983 claims, because the record is not developed enough to determine whether a constitutional violation has occurred and the extent of each defendant's involvement in a potential violation, the defendants have not demonstrated that they are entitled to such immunity on this issue. It certainly could have been "clear to a reasonable officer" that revoking the permit and evicting the festivalgoers, allegedly under threat of arrest, without any court order, injunction, warrant, or probable cause that a criminal violation was occurring, "was unlawful in the situation [they] confronted." *See Tobey v. Jones*, --- F.3d ---, 2013 WL 286226, at *8 (4th Cir. Jan. 25, 2013). Accordingly, on Counts III and X, the defendants' motion for summary judgment will be denied.

## b.  First Amendment (Counts I & XI)[5]

Ihnken also claims that the revocation of the permit was a denial of his First Amendment rights because the county's actions restrained his ability to continue the concert, which is a

---

[4] Unpublished cases are cited for the soundness of their reasoning, not for any precedential effect.

[5] Counts I and XI of Ihnken's complaint are identical because Article 40 of the Maryland Declaration of Rights is generally construed as "'co-extensive' with the protections of the First Amendment." *Newell v. Runnels*, 967 A.2d 729, 743 n.11 (Md. 2009).

protected form of expression. *See Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989). Although Ihnken's arguments regarding the scope of his First Amendment claim are less than clear, the claim appears to amount to an as-applied challenge of the county's temporary use zoning ordinance, § 1-19-8.700 (Defs.' Reply, Ex. D ("Temporary Use Ordinance"), ECF No. 20-4), under the authority of which the festival's permit was first issued and then revoked, leading to the festival's eviction from Aylor's property.

"[A]ny permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Cox v. City of Charleston, SC*, 416 F.3d 281, 284 (4th Cir. 2005) (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992)). Ihnken argues that the festival permit was revoked because of the content of the festival, but this assertion is implausible. The festival permit was revoked because of the noise complaints it generated, and any connection between the content of the music and the regulation of it is incidental to the established significant governmental interest of controlling noise. *See Brown v. Town of Cary*, --- F.3d ----, 2013 WL 221978, at *4-5 (4th Cir. Jan. 22, 2013) (explaining that determining whether a regulation is content-based or content neutral is a "practical inquiry"); *see also City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) ("It is common ground that governments . . . can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise."); *Ward*, 491 U.S at 792. The only scintilla of evidence that the county had a "censorial purpose" is the sole commissioner's statement, after the permit revocation decision had been made, to the effect that he was glad "tree-huggers" were being evicted from the county. Although troubling, this single statement does not mitigate the ample evidence in the record that noise was the central concern of the

officials involved in the eviction decision. Thus, the county's permitting scheme must be assessed as a content-neutral regulation of Ihnken's expression.

The Frederick County temporary use ordinance is narrowly tailored to its significant purposes of regulating the use of land to protect the "safety, health, and environmental" needs of a property and "the surrounding area," as well as to guarantee that sites are "of a sufficient size to accommodate their intended temporary use" and that a "[s]afe and orderly flow of traffic can be ensured." § 1-19-8.700 (ECF No. 20-4). Ihnken himself does not challenge the county's ordinance as overbroad or defective in any way. As applied to the festival, the county had doubts about the permit before it was issued, and the ensuing noise complaints during the first night of the festival obviously confirmed those concerns. The standards set forth in the ordinance, particularly the ordinance's guidelines directing the zoning administrator, before issuing a permit, to ensure that the temporary use being sought will not affect the health and environment of the surrounding area, cover concerns about potential noise emanating from the festival. How the zoning administrator was permitted to go about *revoking* the valid permit, once it had been issued, is the question addressed by Ihnken's procedural due process claim, as explained above. *See also T. Weston*, 2008 WL 3474146, at *12-13. Setting that issue aside, the defendants have demonstrated that the county's regulation of the festival was a narrowly tailored, content-neutral application of a valid zoning ordinance, and they are entitled to summary judgment on Ihnken's First Amendment claim.

### c.   Substantive Due Process and Equal Protection (Counts II & IV)

The defendants are also entitled to summary judgment on Ihnken's other § 1983 claims. First, in order to succeed on a substantive due process claim, Ihnken must prove, in addition to a deprivation of a property interest by the county, that "the [county's] action [fell] so far beyond

the outer limits of legitimate governmental action that no process could [have cured] the

deficiency." *Tri County Paving*, 281 F.3d at 440 (quoting *Sylvia Dev. Corp. v. Calvert County*,

48 F.3d 810, 827 (4th Cir. 1995)). "Substantive due process protections 'run only to state action

so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be

literally incapable of avoidance by any pre-deprivation procedural protections or of adequate

rectification by any post deprivation state remedies.'" *Id.* (quoting *Rucker v. Harford County*,

946 F.2d 278, 281 (4th Cir. 1991). The county's actions may have been rash and taken without

any procedural safeguards, but the proper vehicle for litigating those issues is Ihnken's

procedural due process claim. Otherwise, Ihnken's mere assertion that the county's actions could

not have been rectified by procedural changes is without merit: obviously, if Ihnken could have

availed himself of a proper predeprivation hearing or other legal process, the validity of the

permit and fate of the festival could have been determined before the harm to his livelihood was

done. Such a process either would have validated the county's decision to shut the festival down

or prevented that action, but procedural safeguards would have been effective either way. Thus,

the county's actions did not constitute a substantive due process violation.

Second, under the Equal Protection Clause of the Fourteenth Amendment, where "no

fundamental right or suspect classification is at issue," no violation has occurred "if the

classification drawn . . . is rationally related to a legitimate state interest." *Tri County Paving*,

281 F.3d at 438. Here, Ihnken appears to argue that the county impermissibly treated the festival

differently from others similarly situated based on its expressive content. However, as discussed

above, it is clear that the county's conduct was content-neutral. Thus, no fundamental right or

suspect classification is implicated in Ihnken's claim and "the relevant question under rational-

basis review is whether local officials 'reasonably could have believed that [their] action was

rationally related to a legitimate governmental interest.'" *Id.* at 439 (quoting *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 290 (4th Cir. 1998)). Here, the county obviously was concerned about the noise complaints they had received and the legitimacy of the permit the festival had been issued. While the county may not have pursued the various concerns that ultimately led to the shutdown in a procedurally valid manner, the county has demonstrated that its actions were rational and related to the public welfare. Ihnken also has not adduced any evidence to suggest that the county treated other temporary use permittees of any kind, let alone festival producers, differently from the way they treated him or Aylor. *See id.* at 439-40 (setting out the standard for "class of one" equal protection claims) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)). Ihnken also argues that *NAACP, Frederick County Chapter v. Thompson*, 648 F. Supp. 195, 214 (D. Md. 1986) and *Lloyd v. Waffle House, Inc.*, 347 F. Supp. 2d 249 (W.D.N.C. 2004) provide support for his claim, but both cases involve suspect classifications and have no applicability here. Accordingly, the defendants will be granted summary judgment on Ihnken's equal protection  and substantive due process claims.

## II.      Breach of Contract (Count VI)

Ihnken offers no legal support for his assertion that the county's revocation of the permit, even if it was unlawful, constituted a "breach of contract." While Ihnken's contract with Aylor to lease the farm and to pay all costs Aylor incurred in securing permits for the festival demonstrates that he had a property interest in the permit, this interest does not appear to create contractual rights enforceable against the county. The court is aware of no authority that characterizes a land use or similar permit as a "contract" between a Maryland municipality and the permittee. *Cf. Carey v. Baltimore County*, 278 A.2d 6, 9 (Md. 1971) (stating that a zoning permit is an exercise of a municipality's police power). While Ihnken's suggestion that the

permit created such contractual rights is creative, his claim against the county is better evaluated

under the due process framework discussed above, not under Maryland contract law.

Accordingly, the defendants are entitled to summary judgment on count VI.

### III.     State Tort Claims (Counts V, VII, VIII, IX)

Finally, the defendants are entitled to summary judgment on Ihnken's remaining state law

claims on immunity grounds. The county, and thus the defendants in their official capacities, are

entitled to governmental immunity on Ihnken's common law tort claims under Maryland's Local

Government Tort Claims Act, Md. Code Ann., Cts. & Jud. Proc., § 5-303. *Mora v. City of

Gaithersburg*, 462 F. Supp. 2d 675, 697 (D. Md. 2006) (citing *Austin v. City of Baltimore*, 405

A.2d 255, 256 (Md. 1979)). Local governments are entitled to complete immunity on claims

involving "governmental" (as opposed to "proprietary") functions. *See id.* Permitting, zoning

enforcement, and land use controls are obviously "governmental" functions.

The individual defendants are entitled to statutory immunity on the same claims because

they were acting in a discretionary capacity when they individually and collectively decided to

shut down the festival. *See* Md. Code Ann., Cts. & Jud. Proc., §§ 5-507(b)(1); 5-522(b). In order

to overcome this statutory immunity, a plaintiff must demonstrate the defendants acted with

malice (or, as to state personnel, gross negligence). *See Newell v. Runnels*, 967 A.2d 729, 763

(Md. 2009); *Mora*, 462 F. Supp. 2d at 697. In this context, "malice is defined as behavior

characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing,

ill-will, or fraud." *Newell*, 967 A.2d at 763 (citation and quotation omitted). Gross negligence is

"something more than simple negligence, and likely more akin to reckless conduct . . . a

wrongdoer is guilty of gross negligence or acts wantonly or willfully only when he . . . is so

utterly indifferent to the rights of others that he acts as if such rights did not exist." *Id.* at 764-65

(citation and quotation omitted).

Defendant commissioner Charles Jenkins's e-mail characterizing the festival-goers as

"Birkenstock wearin' tree-huggers," (County E-mails, ECF No. 15-6, at 7), is the only indication

in the record that county officials were motivated by anything other than a reasonable and

appropriate desire to prevent further noise complaints or to appease unhappy constituents. While

Jenkins's statement was in bad taste given the circumstances, the record also shows that a fellow

commissioner chided Jenkins for his comment, (*id.* at 12), and no evidence shows any improper

animus towards the festival motivated the actual decision to end it. Importantly, Jenkins's e-mail

was sent *after* the eviction order was given. (*Id.*) Thus, while the defendants may have acted

unlawfully in summarily terminating the festival, there is no indication that the state of mind of

any of the defendants was *subjectively* malevolent or reckless such that they acted with malice or

gross negligence. *See Newell*, 967 A.2d at 763. Accordingly, the defendants are entitled to

immunity and summary judgment on counts V, VII, VIII, and IX of the amended complaint.

## CONCLUSION

For the above reasons, on the present record, the defendants' motion to dismiss or for

summary judgment will be granted in part and denied in part. Counsel will be contacted to

schedule further proceedings on the remaining claims.

A separate order follows.

February 27, 2013                                    _____/s/_____
Date                                                Catherine C. Blake
                                                    United States District Judge