**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DALE IHNKEN                                  :
                                             :
                                             :
v.                                           :        Civil No. CCB-11-3508
                                             :
                                             :
JAN GARNDER, ET AL.                          :
                                             :

## MEMORANDUM

Plaintiff Dale Ihnken filed this action, raising a number of constitutional and state law

claims, against various Frederick County officials for their shutting down of an arts and music

festival Ihnken put together in June 2009.  On February 27, 2013, the court granted summary

judgment for the defendants on all claims except for Ihnken's procedural due process claims in

Counts III and X of his complaint.[1]  The defendants now move for summary judgment again on

those claims, and Ihnken has cross-moved.  The court will grant summary judgment in favor of

the defendants as to the Frederick County Commissioners' and Bill Bigelow's liability, as well

as to Frederick County Sheriff Charles Jenkins' liability in his official capacity.  Due to disputes

of fact as to the remaining issues, summary judgment otherwise will be denied to both parties.

## BACKGROUND

The court summarized the facts of this case in its February 27, 2013, memorandum

opinion.  (Mem., ECF No. 22, at 1-6.)  Discovery since has shed additional light on what

---

[1] As noted in the court's prior memorandum, Counts III and X are identical because the state and federal
constitutional provisions governing due process—Article 24 of Maryland's Declaration of Rights and the Fourteenth
Amendment of the United States Constitution—have been construed identically except where the Maryland Court of
Appeals has expressly stated that Article 24 is broader. There is no evidence Article 24 is broader as applied to the
facts of this case.  (*See* Mem., ECF No. 22, at 10 n.2 (citing *Ross v. Cecil Cnty. Dep't of Soc. Serv.*, 878 F. Supp. 2d
606, 622 (D. Md. 2012)).)

1

transpired between the parties.

Ihnken contracted with Erin Aylor, the owner of a 91-acre farm in Frederick, to lease his land for the Summer Solstice PROJEKT ("the festival"), a three-day festival combining camping, art, and music. (Venue Contract Agreement, ECF No. 36-10; Summer Solstice PROJEKT Schedule, ECF No. 36-23.)  Ihnken's contract with Aylor provided that Aylor, as "host," would acquire the necessary land use permits for the festival, but that Ihnken, as "producer," would pay Aylor $6,000 for use of the land and would "cover all permitting costs associated with the event." (Venue Contract Agreement.)  The permit was finally approved on June 18, 2009, the day the festival started. (Defs.' Mem., ECF No. 36-1, at 14; Permit, ECF No. 36-3, at 7.)

The first night of the festival there were several complaints about the volume of the music, and county sheriff's deputies responded to Aylor's farm around 11:00 p.m. to have Ihnken turn it off. (*E.g.*, Lori L. Linthicum Aff., ECF No. 36-25, ¶ 13; Police Report, ECF No. 36-31, at 1-3.)  Ihnken refused to do so, citing the permit, but ultimately agreed to turn the music off around 3:00 a.m. (Police Report at 3-5.)  The next day, after determining the festival was occurring in violation of the permit's terms, Zoning Administrator Larry Smith revoked the permit and, accordingly, Frederick County Sheriff Charles Jenkins shut the festival down. (*E.g.*, Smith Dep., ECF No. 36-13, at 64:22-65:6; Smith Aff., ECF No. 36-5, ¶¶ 11-15.)

Although the parties disagree about whether a legal basis for revoking the permit and shutting down the festival existed, what the permit allowed or what representations Ihnken and Aylor made to obtain it are not material to the procedural due process issues in this case.  The summary of facts here will focus, therefore, on what happened between Ihnken and county

officials from the time the festival began to when the decision to revoke the permit finally was made, as those are the facts pertinent to determining what process Ihnken was accorded before the permit was revoked.

### A. Thursday night

After the sheriff's office received multiple complaints about the loud music coming from Aylor's farm, Lieutenant Thomas Winebrenner reported to the event and, according to his account, the following transpired: When Winebrenner told Ihnken he had to turn the music off, Ihnken objected, citing the permit. (Police Report at 3.) When Winebrenner inquired as to how late the permit allowed the music to play, Ihnken told Winebrenner to look at the permit. (*Id.*) When Winebrenner told Ihnken he would start making arrests for disturbing the peace, Ihnken stated he could not because of the permit. (*Id.* at 3-4; *see also* Ihnken Dep., ECF No. 36-7, at 137:15-138:4.) Winebrenner told Ihnken that "perhaps I just need to revoke the permit and end the festival right now." (Police Report at 4.) When Ihnken asked if he could do that, Winebrenner said he did not know but that he needed a resolution to the "noise issue." (*Id.*) The two eventually reached an agreement that Ihnken would turn the music off by 3:00 a.m. and would turn it down in the meantime. (*Id.* at 4-5; *see also* Ihnken Dep. at 138:25-139:10 (stating they agreed the music would go off at 3:30 a.m.).)

Before leaving, Winebrenner told Ihnken that if he received additional calls he would shut down the festival. (Police Report at 5.) He also told Ihnken that the police would investigate the permit in the morning. (*Id.*; Ihnken Dep. at 156:1-7.) In his affidavit, Winebrenner states, "I made it clear that I was going to advise my superiors to look at the permit when the permit office opened in the morning, and to come back and deal with him in the

3

morning.  I told Mr. Ihnken if there were any issues with the permit, they were going to be addressed in the morning. . . . I told him, 'I am pretty sure once we look at the permit, you are not going to be able to do this anymore.'"  (Winebrenner Aff., ECF No. 36-35, ¶ 12.)  In the early morning on Friday, Winebrenner relayed the night's events to the supervisor entering on duty after him by email.  (*See* Winebrenner Email, ECF No. 36-36.)  There appears to be no material dispute that the encounter between Winebrenner and Ihnken occurred as alleged by the defendants.

### B.  Friday morning

The next morning, the Frederick County Board of County Commissioners ("the Board") became aware of the previous night's events after Commissioner Jan Gardner received a complaint from a constituent. (June 19, 2009 Emails, ECF No. 36-37, at 2-3.)  She forwarded it to the rest of the Board, as well as to Sheriff Jenkins and Smith.  (*Id.*)

Smith, Sheriff Jenkins, Zoning Inspector Bill Bigelow, and another sheriff's deputy went to Aylor's property to investigate around 10:00 a.m. on Friday.  (Police Report at 8; June 19, 2009 Emails, ECF No. 36-37, at 1.)  When they arrived, they were unable to find Aylor, and Ihnken was away running errands.  (Ihnken Dep. at 150:16-151:23, 161:8-162:8; June 19, 2009 Emails, ECF No. 36-20, at 3.)

While they were on the property, Smith and Sheriff Jenkins observed what they viewed as further violations of the permit and law.  Smith observed a beer truck with beer on a tap and heard from Bigelow that a bartender was on the premises even though Aylor and Ihnken had not obtained a license to serve alcohol and the permit did not indicate that alcohol would be at the event.  (Smith Aff. ¶ 12; Smith Dep. at 53:3-7.)  Smith testified at his deposition, however, that,

4

despite his observations, he did not know who was selling alcohol nor did he speak with anyone who was selling alcohol.  (Smith Dep. at 53:8-13.)  Sheriff Jenkins similarly testified that he never spoke with a beer vendor or saw anyone actually consuming alcohol, although he saw the presence of a vendor and people bringing their own alcohol onto the premises.  (Jenkins Dep., ECF No. 36-38, at 68:22-69:4, 85:13-19.)  Smith also became concerned about the fact that there was only one driveway serving the property for the "hundreds of people . . . camping" and the 1,000 to 1,200 or more people he heard would be attending.  (Smith Aff. ¶ 13; *see also* Smith Dep. at 49:9-16.)

At some point while on the property, Smith made the decision to revoke the permit and Jenkins made the subsequent decision to shut down the festival.  Smith stated in his affidavit that he decided to revoke the permit because of the music from the previous night, the observed violation of the alcohol ordinance, and safety concerns arising from the limited means of entering and exiting the event.  (Smith Aff. ¶¶ 13, 15.)  With the permit revoked, the use of the land for the festival was no longer authorized under the county's zoning laws.  (Smith Aff. ¶ 16.)  According to Smith, it was Jenkins who decided to shut down the festival.  (Smith Dep. at 64:22-65:6.)  Jenkins testified at his deposition that he decided to shut down the festival when Ihnken indicated that he did not intend to end the music before 5:00 p.m. and the perceived violation of the alcohol ordinance.  (Jenkins Dep., ECF No. 36-38, at 83:5-20.)  County Commissioner Kai Hagen, who also visited the property on June 19th, observed in an email later that the alcohol violation appeared to be the "straw that broke the camel's back."  (June 19, 2009 Emails, ECF No. 36-20, at 3-4.)  After making the decision to revoke the permit, Smith informed those who appeared to be in charge that he was shutting down the festival.  (Smith Dep. at 66:8-22.)

The parties have varying recollections of when the decision to revoke the permit and shut down the festival was made and with whom Smith and Jenkins spoke and when they spoke to them.  Smith does not remember when he made the decision to shut down the festival, but believes it was sometime between 10:00 a.m. and noon.  (Smith Dep. at 66:5-11.)  Jenkins testified at his deposition that he informed Ihnken at 1:00 p.m. that the festival would be shut down.  (Jenkins Dep., ECF No. 36-38, at 91:12-17.)  Smith claims to have "spoke[n] to several people" at the property, whom he does not identify.  (Smith Aff. ¶ 15.)  He testified at his deposition, however, that he never spoke with Ihnken or gave him notice of his intent to revoke the permit.  (Smith Dep. at 53:17-19, 64:7-18, 65:15-21.)  Jenkins testified at his deposition that he spoke with Ihnken and attempted to come to a compromise as to when the music could be played but that Ihnken refused to turn off the music any earlier.  (Jenkins Dep., ECF No. 36-38, at 54:19-55:17, 60:18-61:10.)  He also testified that he does not remember ever discussing the presence of alcohol with Ihnken.  (*Id.* at 68:8-17, 69:7-12.)  He did indicate, however, that he made the decision to shut down the festival after Ihnken refused to turn the music off at an earlier time.  (*Id.* at 83:5-20.)

Keith Ihnken, the plaintiff's brother and the person considered "third in charge" at the festival after Ihnken and Aylor, testified at his deposition that he spoke to Smith and Jenkins when they first arrived at the property, while Ihnken was away running errands.  (Keith Ihnken Dep., ECF No. 36-39, at 31:6-9, 36:8-16.)  According to Keith, Smith and Jenkins told him the festival had violated the permit, they were going to shut it down, and they wanted to be let on the property.  (*Id.* at 33:20-24.)  Keith eventually told them to leave Aylor's property, at which point, according to Keith, they blocked both ends of the street and turned away people trying to get to

6

the festival, telling them they were shutting it down. (*Id.* at 31:6-18.) Keith testified at his deposition that Smith, Jenkins, and the other officials there would not allow Ihnken's vehicle back on the property when he returned from running errands and that he "vaguely remember[s]" them talking with Ihnken about the permits but does not remember any details. (*Id.* at 37:15-38:9.)

Ihnken testified at his deposition that he discussed the times allowed for music under the terms of the permit with Smith and Jenkins but that they essentially told him the decision to shut down the festival already had been made. (Defs.' Mem. at 25 (citing Ihnken Dep. at 58:13-59:15)[2]; *see also* Ihnken Dep. at 171:18-20 (testifying that he was told the event was being shut down as he drove up to the property); Ihnken Resp. to Interrogs., ECF No. 40-1, at 5 (stating that he attempted to negotiate with Jenkins when he arrived back at the property and that Jenkins informed him the decision had already been made).)

As a result of the festival being shut down, Ihnken was forced to forfeit the costs of the festival, including the rent he paid Aylor for the space. Ihnken had plans to hold three additional festivals in 2009, but he states that, as a result of the cancellation, his reputation was ruined and he could no longer produce similar festivals. (Ihnken Resp. to Interrogs. at 2.) Thus, the county's decision allegedly cost him thousands of dollars in profits and his career as a festival promoter. (*Id.* at 1-2, 10-14.)

## ANALYSIS

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

---

[2] Ihnken's testimony about what he discussed with Smith on June 19th is only included in the defendants' memorandum and not in either party's exhibits. Ihnken does not appear to dispute, however, the accuracy of the excerpt as it is reproduced in the defendants' memorandum.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added).  Whether a fact

is material depends upon the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986).  Accordingly, "the mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.*  "A

party opposing a properly supported motion for summary judgment 'may not rest upon the mere

allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that

there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d

514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must

view the evidence in the light most favorable to the nonmovant and draw all justifiable

inferences in his favor.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also*

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*,

721 F.3d 264, 283 (4th Cir. 2013) (citation omitted).  At the same time, the court must not yield

its obligation "to prevent factually unsupported claims and defenses from proceeding to trial."

*Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

   "When both parties file motions for summary judgment, the court applies the same

standards of review." *Loginter S.A. Y Parque Indus. Agua Profunda S.A. Ute v. M/V*

*NOBILITY*, 177 F.Supp.2d 411, 414 (D. Md. 2001) (citing *Taft Broad. Co. v. United States,* 929

F.2d 240, 248 (6th Cir. 1991)). "The role of the court is to 'rule on each party's motion on an

individual and separate basis, determining, in each case, whether a judgment may be entered in

accordance with the Rule 56 standard.'" *Id.* (quoting *Towne Mgmt. Corp. v. Hartford Acc. &*

*Indem. Co.*, 627 F.Supp. 170, 172 (D. Md. 1985)).

   Ihnken brings his procedural due process claims under 42 U.S.C. § 1983.  To establish a

claim under § 1983, a plaintiff must prove (1) that the defendant deprived him "of a right secured by the Constitution or laws of the United States" and (2) that such deprivation was committed under the color of state law. *Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970); *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001)).  County governments and their officials are persons acting under color of state law and are subject to suit under § 1983. *See, e.g.*, *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Thus, if the shutdown was a deprivation of Ihnken's constitutional rights, any county official involved in the shutdown may be liable, unless they are entitled to qualified immunity. *See id.* at 783.

## I.      Ihnken's Constitutionally-Protected Property Interest

As a preliminary matter, the defendants continue to claim that Ihnken did not have a constitutionally-protected property interest in the permit of which he could have been deprived. In its February 27, 2013, opinion denying summary judgment for the defendants on Ihnken's procedural due process claims, the court found that Ihnken "paid for the permit, he suffered a substantial actual injury from its revocation, and he was *entitled*, as a lessee by contract, to all of the land use rights" granted by the permit.[3]  (Mem., ECF No. 22, at 12); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) ("To have a property interest in a benefit, a person clearly must have . . . a legitimate claim of entitlement to it.")  The defendants offer several reasons as to why the court's prior conclusion is incorrect, none of which are persuasive.

---

[3] As the court noted in its earlier opinion, the defendants offer no evidence that land use permits were revocable at will.  In fact, the Zoning Ordinance states that permits are "revocable upon noncompliance." *See Richardson v. Town of Eastover*, 922 F.2d 1152, 1156, 1158 (4th Cir. 1991) (noting that a protected property interest exists in a license that can be revoked only for cause and that statutes providing reasons for why a license can be withheld create a reasonable inference that it cannot be withheld absent one of those reasons).

The defendants first argue that, because only Aylor's name was on the permit and because, under the Frederick County Zoning Ordinance, temporary use permits could not be transferred or assigned, Ihnken had no property interest.  (Defs.' Mem. at 33 (citing Zoning Ordinance, ECF No. 36-14, § 1-19-2.110(F)).)  According to the defendants, Ihnken only had a contractual entitlement to use the land under the terms of his agreement with Aylor, not to the permit.  The defendants cite no authority for their claim.  Further, the fact remains that Ihnken paid for the permit and, under the lease, it was obtained for Ihnken's benefit.  The case to which the court pointed for its conclusion in its prior opinion thus remains persuasive.  *See Romanello v. Maguire*, 404 A.2d 833, 836 (R.I. 1979) (finding the plaintiffs could bring a claim for due process violations after the town council denied their event permit even though a third party had applied for the permit on their behalf and their names were not on the permit).  The defendants argue *Romanello* is not on point because Ihnken admitted in his deposition that Aylor was not his agent in applying for the permit.  (*See* Ihnken Dep. at 124:9-18.)  His statement, however, is based on his apparent belief that Aylor would only be his agent if Aylor was Ihnken's employee, (*see id.*), and thus does not provide persuasive evidence that Ihnken was not entitled to the benefit of the permit despite the fact that he paid for it and had Aylor obtain it on his behalf.

The defendants also argue that Ihnken should be estopped from claiming a protected property interest in the benefits of the permit because he and Aylor allegedly made misrepresentations about the festival to obtain the permit.  According to the defendants, therefore, Ihnken and Aylor never obtained a permit for an outdoor music festival and thus their ability to hold one is not a vested property interest.  (Defs.' Mem. at 35-37; Defs.' Reply, ECF No. 41, at 14-17.)  To support their claims, the defendants rely on *Marzullo v. Kahl*, a Maryland

Court of Appeals case in which the court held a property owner did not have a vested property interest in using his land to raise reptiles simply because he had done so under an erroneously issued permit for the previous four years. 783 A.2d 169, 189 (Md. 2001). The case is not on point, because the court was addressing the issue of whether a permit substantively provided for a certain land use. It was not addressing whether a property interest had been revoked in violation of the holder's due process rights. In relying on the case, the defendants fail to recognize that Ihnken's due process claims do not turn on whether the permit actually allowed the festival to proceed as it did. It turns only on whether Ihnken was given proper notice and an opportunity to be heard before the permit—whatever it may have lawfully allowed—was revoked.[4]

Accordingly, the court still finds that Ihnken had a protected property interest in the benefit of the temporary use permit.

## II.     Notice and an Opportunity to be Heard

Where a person holds a constitutionally-protected property interest, they are entitled to procedural due process under the Fourteenth Amendment before the State can deprive them of that interest. Procedural due process requires notice and an opportunity to be heard. *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 146 (4th Cir. 2014); *Richardson*, 922 F.2d at 1159.

The notice provided must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present

---

[4] For similar reasons, the plaintiffs' argument that Ihnken also is estopped from claiming a property interest because he did not comply with the requirements for an outdoor music festival, (*see* Defs.' Reply at 37 (citing *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006) (noting that "it is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage"))), fails.

their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

"The right to be heard has little reality or worth unless one is informed that the matter is pending

and can choose for himself whether to appear or default, acquiesce or contest." *Id.*  The manner

by which notice is provided must be, therefore, that which someone "desirous of actually

informing the absentee" would use.  *Id.* at 315.

To determine whether the process received was adequate, courts consider "1) the private

interest involved, 2) 'the risk of an erroneous deprivation of such interest through the procedures

used, and the probable value, if any, of additional or substitute procedural safeguards,'[5] and 3)

the state interest, including fiscal and administrative burdens imposed by additional process."

*Snider Int'l Corp.*, 739 F.3d at 149 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  A

pre-deprivation opportunity to be heard is typically required, unless there is a need for quick

action by the State or pre-deprivation proceedings are impractical.  *Presley v. City of*

*Charlottesville*, 464 F.3d 480, 489 (4th Cir. 2006).  What is most important, however, is that a

hearing—in whatever form required by the circumstances—be provided "at a meaningful time

and in a meaningful manner."  *Richardson v. Town of Eastover*, 922 F.2d 1152, 1160 (4th Cir.

1991) (quoting *Matthews*, 424 U.S. at 333) (internal quotation marks omitted).

Defendants claim Ihnken received constitutionally adequate pre-deprivation procedure on

Thursday night when Winebrenner went to the property to have the music turned off and again

when Smith and Jenkins went to the property the next day.  (Defs.' Mem. at 41; Defs.' Reply at

---

[5] Although the Fourth Circuit previously has considered what the plaintiff may have offered in defense at a hearing
to evaluate whether additional process was required, *see Richardson*, 922 F.2d at 1161, the parties proffered no
evidence as to what might have been offered at a hearing in this case.  To the extent the defendants' liability
ultimately turns, even in part, on this issue, the court cannot evaluate it now given the lack of evidence on the record.
The defendants have not asserted that a proper hearing would have been without value.  (*See* Jenkins Dep., ECF No.
36-38, at 54:19-55:13 (claiming he attempted to negotiate with Ihnken as to what time the music would need to be
turned off).)

6.)  They further claim that, regardless of any pre-deprivation process, Ihnken had access to a

post-deprivation appeals process that provided adequate protection of his rights.  (Defs.' Mem. at

42-45.)   Finally, they argue that the defendants' conduct was random and unauthorized, barring

recovery under § 1983.  (Defs.' Mem. at 43.)  The court will address these arguments in reverse.

### A.  Random and Unauthorized Deprivations

Random and unauthorized deprivations of property, whether done negligently or

intentionally, do not violate the Due Process Clause if the state provides adequate post-

deprivation procedures.  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451

U.S. 527, 543-44 (1981).  Defendants claim that, because Ihnken does not allege the defendants'

were acting under any official procedures established by Frederick County or the state, any

deprivation in this case was random and unauthorized.  In *Zinermon v. Burch*, the Supreme Court

made clear, however, that the *Parratt/Hudson* rule is an application of the *Matthews* framework

for determining if the process provided was constitutionally adequate.  494 U.S. 113, 128 (1990).

Thus, the *Zinermon* Court considered the interests involved, the risk of an erroneous deprivation,

and the value of additional procedures, and ultimately concluded that the *Parratt/Hudson* rule

should not control where:  first, the deprivation at issue was predictable; second, pre-deprivation

procedures were not impossible; and third, the defendants' conduct was not unauthorized

because the state had "delegated to them the power and authority to effect the very deprivation

complained of."  *Id.* at 136-38.

Considering these three factors in this case, the deprivation of Ihnken's property is not

properly characterized as random and unauthorized.  First, Smith was clearly authorized to

revoke the permit by the Zoning Ordinance, which defendants admit in their memorandum. (*See*

Defs.' Mem. at 39; *see also* Zoning Ordinance § 1-19.2.100(A), (C) (stating "[i]t is the duty of the Zoning Administrator to administer and to enforce the provisions of this chapter" and "[t]he Zoning Administrator or his official agent has the power to take any lawful action to prevent or to abate a violation of this chapter"); Smith Aff. ¶ 9 (stating Smith had "the duty and the responsibility to revoke a temporary use permit if [he] determine[d] that activity is taking place which was not authorized by the permit . . . and is not in compliance with safety, health, and environmental standards or is detrimental to the surrounding area").)  Second, given that the Zoning Ordinance gave Smith the power to revoke permits but articulated no process by which he was to determine a permit-holder was violating the ordinance or the permit's terms, it is foreseeable and predictable that an erroneous deprivation could occur.  Finally, pre-deprivation procedures do not appear to have been impossible.  As discussed more fully below, although the procedures required by the Due Process Clause depend on the situation, the facts of this case demonstrate there was time to properly notify Ihnken of the pending revocation of the permit and to provide him with an informal, but meaningful, opportunity to tell his side of the story.

### B.  Adequacy of Post-Deprivation Procedures

The defendants' also claim that the post-deprivation remedies available to Ihnken were constitutionally adequate, rendering pre-deprivation process unnecessary.  (Defs.' Mem. at 42-45.)  This claim fails as well.

Providing only post-deprivation process is constitutionally inadequate absent "the necessity of quick action by the State or the impracticality of providing any predeprivation process." *Presley*, 464 F.3d at 489; *cf. Zinermon*, 494 U.S. at 132 ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so

regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking."). There is no evidence that some form of pre-deprivation process was impractical here.  As of Friday morning at 10:00 a.m.—when the officials arrived—the playing of music would not constitute a violation of the permit's claimed requirements again until 5:00 p.m., giving Smith and Jenkins almost an entire business day to handle the issue.  Smith and Jenkins state they did not want to come back at night to shut down the festival due to safety concerns, but nothing in their recollection of the day's events indicates that an emergency was ongoing at 10:00 a.m., or even at 1:00 p.m., when Sheriff Jenkins claims the decision to shut down the festival was made. Further, to the extent the defendants are claiming the ongoing alcohol violations justified immediate action making pre-deprivation process impractical, there is no evidence the alcohol laws authorized the immediate shutting down of a public event.  In fact, Jenkins admitted in his deposition that the alcohol violation was a matter for the Liquor Board and subject to a citation, (Jenkins Dep., ECF No. 36-38, at 83:22-84:4, Jenkins Dep., ECF No. 40-5, at 70:15-71:8). Similarly, there is no evidence demonstrating that the number of people at the festival that morning—which was never verified by anyone to have been more than that allowed under the permit—and the single driveway for entry and exit—which the county was aware of from the time of the initial permit application—suddenly created an emergency situation requiring immediate action.  The county was required, therefore, to provide pre-deprivation process.

### C.  Pre-Deprivation Process

The Defendants claim Ihnken received adequate pre-deprivation notice and an opportunity to be heard on Thursday night when he spoke with Lieutenant Winebrenner and again on Friday morning when Smith and Jenkins came to Aylor's farm.  The court concludes

that any process provided by Winebrenner was inadequate.  As to Friday morning, there are genuine disputes of material fact as to what occurred, rendering summary judgment in favor of either party inappropriate at this time on the issue of whether Ihnken received adequate procedural protections under the Due Process Clause.

### 1.  Process provided by Winebrenner

The defendants claim Winebrenner provided Ihnken with an adequate opportunity to be heard on Thursday night and that, even if Winebrenner did not hold an adequate hearing, he provided adequate notice that a hearing would be held the following morning.  There appears to be no genuine dispute as to what transpired between Winebrenner and Ihnken, and, to the extent there is, even assuming Winebrenner's visit happened as the defendants claim, his meeting with Ihnken did not satisfy the requirements of the Due Process Clause.

First, Winebrenner did not provide Ihnken with an adequate opportunity to be heard. With Winebrenner's equivocation, admitted lack of knowledge as to his own authority to shut down the festival, and his ultimate agreement with Ihnken that he could play music until 3:00 a.m., Ihnken can hardly be said to have been alerted to the pendency of the revocation of the permit such that he could properly present his side of the story.  *See Mullane*, 339 U.S. at 314 (holding that the notice provided must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action").  Further, having no authority to revoke the permit himself, as defendants admit (*see* Defs.' Mem. at 39 (citing Zoning Ordinance § 1-19-2.100(C) ("The Zoning Administrator or his official agent has the power to take any lawful action to prevent or to abate a violation of this chapter."))), any hearing would not have been meaningful, especially given Winebrenner's unfamiliarity with the permit and the fact that his

16

account of what occurred was passed through at least one person, possibly more, before it reached the decisionmaker, Smith.  Given Ihnken's significant financial interest in the permit— which the defendants' acknowledged at the hearing on this motion—something more than the conversation with Winebrenner was required.

In addition, Winebrenner cannot be said to have provided notice that a hearing would occur the following morning, given that, at most, he told Ihnken the permit issues would be "addressed" in the morning.  (Winebrenner Aff. ¶ 12.)  "Addressing" the issues with the permit could mean anything from clarifying its terms, to negotiating its application to the event, to revoking it and shutting down the festival.  Further, he never told Ihnken a specific time that officials from the county would be coming to the farm such that Ihnken would know when to be there for any hearing.

### 2.  Process provided on Friday morning

Whether Ihnken received adequate process thus turns on the events of Friday morning, when Smith and Sheriff Jenkins went to Aylor's property to investigate the previous night's events.  As outlined in the factual summary of this memorandum, there are genuine disputes of material fact as to whether notice and a hearing were provided to Ihnken before the permit was revoked and the festival shut down.  Ihnken claims the officials began taking steps to shut down the festival before he was given a chance to be heard and there is evidence in the record to support such a claim.[6]  (*See* Keith Ihnken Dep. at 31:6-32:6, 33:20-24 (recalling that the county

---

[6] The defendants claim Ihnken forfeited his right to a hearing when he chose not to be at the farm on Friday morning.  This claim is without merit.  Although it is true that an official does not violate an individual's procedural due process rights where he offers an opportunity for a hearing but the individual refuses, *see Buschi v. Kirven*, 775 F.2d 1240, 1255-56 (4th Cir. 1985) (finding a state official did all that was required when he offered to give discharged employees an interview but they refused), it does not appear Ihnken chose not to participate in a hearing here.  He was not given proper notice by Winebrenner the night before, as already discussed, that Smith and Jenkins would arrive at the farm when they did.  Further, although both sides appear to agree Ihnken took one hour to return

officials wanted to be let on the property before Ihnken returned the morning of June 19 because they were going to shut down the festival and that they began turning people away from the festival immediately); Ihnken Dep. at 150:16-23, 152:21-25, 171:18-25 (stating that, while he was running errands, his brother called to inform him the county was shutting down the festival and that when he arrived back at the property, Jenkins and Smith were already telling people the event was being shut down); June 19, 2009 Emails, ECF No. 36-20, at 4 (stating that it was Commissioner Kai Hagen's impression that Smith and Jenkins were going to try to get in touch with Ihnken to communicate an ultimatum, but that upon learning of alcohol sales decided right away to shut the festival down).)   There is also evidence supporting the defendants' claim that they discussed the permit with Ihnken, or gave him the opportunity to discuss it, before they finally revoked it and shut down the festival.[7]   (*See, e.g.*, Jenkins Dep., ECF No. 36-38, at 54:19-55:13.)   As counsel for both parties acknowledged at the hearing on this motion, however, no one seems to have a clear memory of the timeline of events on the morning of June 19, 2009.   It is for the factfinder to decide which memories to credit.[8]

---

to the property when he found out the officials were there to revoke the permit, (*see* Ihnken Dep. at 151:19-23), there are no facts demonstrating that Smith and Jenkins placed any time limit on his return or that he was attempting to delay or avoid any hearing, (*see id.* 150:16-151:18 (explaining that Ihnken was on the phone with the governor's office between the time when he was first notified Jenkins and Smith were at Aylor's property and when he began driving back to Aylor's property)).

[7] The defendants admitted at the hearing, through counsel, that the county officers did begin turning people away from the festival before Ihnken returned from his errands.

[8] In addition, there are three reasons the defendants have proffered for finally revoking the permit and shutting down the festival:  the music, a perceived alcohol violation, and concerns for attendees' safety.  (*See, e.g.*, Jenkins Dep., ECF No. 36-38, at 68:22-69:6 (stating the alcohol violations were a factor in the decision to shut down the festival).)  Even accepting the defendants' version of events, it appears only the music issue was communicated to Ihnken.  ((*See* Ihnken Resp. to Interrogs. at 5 (stating that when Ihnken arrived at the property he talked with Jenkins about the music); Smith Dep. at 53:17-19, 64:7-18 (stating that Smith did not speak to Ihnken before or after the shutdown); Ihnken Dep. at 150:16-24 (testifying that, while running errands on June 19, 2009, Ihnken received a call from his brother informing him that the officials had decided to shut the festival down because they had played music after 5:00 p.m.); Jenkins Dep., ECF No. 36-38, at 69:7-12 (stating Sheriff Jenkins did not discuss anything other than the noise issue with Ihnken).)  In fact, the defendants admitted at the hearing on this motion that their safety concerns were never communicated to him.  Thus, even if the factfinder ultimately concludes Ihnken did receive a hearing on Friday morning, if the factfinder also finds that the decision to revoke the permit and shut down

In sum, summary judgment will be denied as to whether Ihnken received adequate process before the permit was revoked.[9]

### III.   Liability of Frederick County Commissioners

Summary judgment will be granted in favor of the defendants as to the Frederick County Commissioners' liability in their individual and official capacities.

#### A.   Frederick County Commissioners' Liability in their Individual Capacities

The commissioners are only liable in their individual capacities under § 1983 if it is "affirmatively shown that [they] acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985).   Officials are deemed to have acted personally in the deprivation of a person's rights where they have personal knowledge of and involvement in the deprivation.  *Id.*  Ihnken claims the subsequent endorsement of Smith and Jenkins' decisions by some county commissioners in an email exchange demonstrates their personal involvement in the deprivation of the permit.  (Pl.'s Mem., ECF No. 40, at 19-20.) Although later endorsement of the decision may provide evidence of the commissioners'

---

the festival turned on an issue never presented to Ihnken, he still may have been deprived of his Due Process rights. *See, e.g.*, *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) ("Due process requires that there be an opportunity to present every available defense."); *Linton v. Frederick Cnty. Bd. of Cnty. Comm'rs*, 964 F.2d 1436, 1440 (4th Cir. 1992) (noting that due process requires that the person to be deprived of property receive information adequate to focus him on the conduct relied upon for justifying the deprivation).

[9] Smith and Jenkins claim they are entitled to qualified immunity.  As is evident from the court's discussion, however, there are material factual disputes as to both the officials' conduct and whether they provided Ihnken with any process prior to revoking the permit and shutting down the festival; the officials claim they spoke to Ihnken before revoking the permit, and Ihnken claims they began shutting down the festival before providing him with notice and a hearing.  Granting summary judgment is thus inappropriate at this time.  *See Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 179-80 (4th Cir. 1998) (holding that "summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants" (internal quotation marks and citation omitted)).  Certainly, a reasonably competent county official should have been aware of the procedural requirements of providing notice and some kind of hearing before revoking a permit that can only be revoked for cause.  *See Richardson*, 922 F.2d at 1156, 1159 (holding that "[a] license issued by the state which can be suspended or revoked only upon a showing of cause creates a property interest protected by the Fourteenth Amendment" and that "[d]ue process, *at a minimum*, requires that a person be given notice of impending action and afforded a hearing" (emphasis added)).

personal knowledge, it does not provide evidence that they directly participated in making the

decision. *See De Ventura v. Keith*, 169 F. Supp. 2d 390, 395 (D. Md. 2001) (holding a defendant

police officer was not liable under § 1983 where he requested that other police officers respond

to the scene but was not present during and did not participate in the allegedly unlawful arrest).

In fact, the emails demonstrate that the commissioners did not instruct Smith to revoke the

permit and shut down the festival beforehand, did not have a full understanding of what Smith

had done or how he had come to the decision, and were actively avoiding involvement in the

decision.[10]  (*See* June 19, 2009 Emails, ECF No. 36-20, at 1-3.)

To the extent Ihnken is claiming the commissioners are individually liable under a theory

of supervisory liability, his claim still fails as a matter of law.  To establish supervisory liability

under § 1983, a plaintiff must identify "persons in the decisionmaking chain whose deliberate

indifference" permitted the alleged constitutional violations.  *Shaw v. Stroud*, 13 F.3d 791, 798

(4th Cir. 1994).  First, there is no evidence the commissioners were in the "decisionmaking

chain" in this case.  Any appeal from Smith's decision regarding the permit would have gone

first to the Board of Appeals and then to the state courts.  (*See* Zoning Ordinance §§ 1-19-

2.150(D), 1-19-3.230.)  Second, even if it could be said the commissioners had authority over

Smith's decisionmaking, Ihnken still must prove 1) that the commissioners had actual or

constructive knowledge that their subordinates were engaged in conduct posing a "pervasive and

unreasonable risk" of constitutional injury to citizens like Ihnken, 2) that the commissioners'

showed "deliberate indifference to or tacit authorization of the alleged offensive practices," and

---

[10] The defendants also claim in their motion for summary judgment that Sheriff Jenkins testified at his deposition that he did not consult with Commissioner Hagen when Hagen was at Aylor's property the morning of June 19th. (Defs.' Mem. at 48.)  The cited pages of the deposition are not included in the defendants' or the plaintiff's exhibits, but Ihnken does not appear to dispute the existence of Jenkins' testimony.

3) that there was an "affirmative causal link" between the commissioner's inaction and Ihnken's constitutional injury. *Shaw*, 13 F.3d at 799 (internal quotation marks omitted) (citations omitted). Ihnken has pointed to no evidence that the constitutional violations he alleges here were widespread or had happened on prior instances and he cannot, therefore, satisfy even the first element of the three-prong test. *See id.* (noting that a plaintiff must provide evidence that the allegedly unlawful conduct is widespread or had occurred on several different occasions for the risk to be considered "pervasive").

**B. The Commissioners' Liability in their Official Capacities**

A suit against the commissioners in their official capacities is a suit against the county. *See Revene v. Charles Cnty. Commissioners*, 882 F.2d 870, 874 (4th Cir. 1989). The county is liable if "the execution of a [county] policy or custom" caused the permit's revocation. *Love-Lane*, 355 F.3d at 782. Ihnken has proffered no evidence of a policy or custom that led to the deprivation in this case. This is not dispositive, however, because the county also can be held liable for a single decision of the Board if, in taking action, the Board was exercising "final authority to establish municipal policy with respect to the action ordered." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)) (internal quotation marks omitted). As is clear from the discussion regarding the commissioners' individual liability, neither the Board nor any of its members took any official action in this case that would have exposed the county to liability. Accordingly, the county is not liable on the basis of the Board's conduct.

**IV.  Bill Bigelow's Liability**

Ihnken does not specify whether he sues Bill Bigelow in his individual or official

capacity,[11] (*see* Am. Compl., ECF No. 8, at 2), but there is no basis for liability under either.  The evidence of Bigelow's involvement with the events of June 18-19, 2009, only demonstrates that he went to the property, along with Smith, Jenkins, and a sheriff's deputy, Troy Barrick.  (*See* Jenkins Dep., ECF No. 36-38, at 38:17-19.)  In their opposition memorandum, the defendants also state that he spoke with individuals on the property.  (Defs.' Mem. at 28, 48).  The evidence provides no facts supporting a finding that Bigelow was involved in making the decision to revoke the permit or in shutting down the festival, even if the court assumes he provided information regarding the conversations he had with festival attendees to Smith and Jenkins.  Summary judgment will be granted in Bigelow's favor and Ihnken's claims against him will be dismissed.

## V.      Sheriff Jenkins' Liability

### A.  Official Capacity

Defendants claim Ihnken's suit against Sheriff Jenkins in his official capacity is a suit against the State of Maryland, and thus Ihnken's claims against Jenkins in his official capacity must be dismissed.  (Defs.' Mem. at 47); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983.").  Whether a sheriff acts on behalf of the county or the state depends on the function in which he is engaged, and making the determination is a question of state law. *Dotson v. Chester*, 937 F.2d 920, 924 (4th Cir. 1991).  Sheriffs generally are treated as state

---

[11]  Ihnken also does not clarify whether he sues Smith in his individual or official capacity.  The court treats Ihnken's suit as one against Smith only in his individual capacity, however, based on his allegations concerning his procedural due process rights—which do not include a claim that Smith was acting in accordance with government policy or custom—the fact that he seeks damages, and the defendants' apparent interpretation that he is suing Smith only in his individual capacity. *See Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995) (articulating the factors for determining in which capacity a plaintiff sues a defendant under § 1983).

officials under Maryland law when engaged in traditional law enforcement functions. *Kennedy v. Widdowson*, 804 F. Supp. 737, 742 (D. Md. 1992). Defendants claim Jenkins was engaged in such traditional law enforcement functions when he shut down the festival, (Defs.' Mem. at 47), and Ihnken does not appear to dispute the claim, (*see* Pl.'s Mem. at 20-21). Because Jenkins was acting as an official of the state, suing Jenkins in his official capacity is a suit against the state of Maryland and thus cannot proceed.

### B.  Individual Capacity

The defendants argue that Sheriff Jenkins should not be held individually liable for any deprivation because in shutting down the festival activities he was lawfully protecting public safety. (Defs.' Mem. at 45-47.) They claim shutting down the festival was warranted given the "criminal conduct" from the night before,[12] the ongoing violation of the alcohol ordinance, and the perceived threat to public safety of having so many people on Aylor's farm who were unwilling to comply with police orders. (*Id.*; *see also* Police Report at 1 (citing the crimes alleged to have been committed on Thursday night); Kathy Vahle Email, ECF No. 36-40 (citing the relevant alcohol ordinance barring the sale of alcohol at Aylor's farm); Smith Aff. ¶ 13 (noting his concerns about the number of people in attendance).)

With respect to the first two arguments, regarding the prior criminal conduct and the ongoing alcohol ordinance violation, the defendants cite no authority under Maryland law or Frederick County ordinance for Sheriff Jenkins to summarily shut down an entire public event on those bases. Further, the defendants cite no case law supporting their position. The defendants cite several cases holding that courts should not interfere with investigative or arrest decisions in

---

[12] In his police report, Lieutenant Winebrenner identified disturbance of the peace and disorderly conduct as the crimes committed on Thursday night. (Police Report at 1.)

criminal cases—i.e. by requiring law enforcement to indict or arrest at a specific moment—
which are not on point. *See, e.g.*, *United States v. Lovasco*, 431 U.S. 783, 795-96 (1977)
(holding that prosecuting a defendant after investigative delay does not deprive him of due
process). Liability in this case is not based on any failure of Sheriff Jenkins to act at a certain
moment. In fact, if Sheriff Jenkins had wanted to arrest Ihnken for the alleged criminal activity
from the night before on Friday he may have been able to do so. But, this case centers on
whether Jenkins could shut down the entire festival on that basis. The two actions are not the
same.

With respect to shutting down the festival because of Sheriff Jenkins' belief that it was a
threat to public safety, this appears to be a repackaging of the argument that pre-deprivation
process was unavailable due to the need for quick action by the State. *See Presley*, 464 F.3d at
489 (holding that a pre-deprivation opportunity to be heard is typically required, unless there is a
need for quick action by the State or pre-deprivation proceedings are impractical). The court has
already rejected that argument. Sheriff Jenkins will not be dismissed from the suit.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment will be granted
in part as to the liability of the Frederick County Commissioners and Zoning Inspector Bill
Bigelow, in their individual and official capacities, and as to Sheriff Charles Jenkins in his
official capacity. The remainder of the defendants' motion will be denied and the plaintiff's
motion for summary judgment will be denied. A separate order follows.


September 3, 2014                              /s/
      Date                                    Catherine C. Blake
                                              United States District Judge

24