IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DALE IHNKEN                              :
                                         :
                                         :
   v.                                    :   Civil No. CCB-11-3508
                                         :
                                         :
CHARLES JENKINS, et al.                  :
                                         :

## MEMORANDUM

Dale Ihnken organized a festival in Frederick County, Maryland, that was to be held Thursday, June 18, 2009, through June 21, 2009. On the afternoon of Friday, June 19, however, county officials revoked the temporary land use permit that ostensibly authorized that festival and ordered the immediate cancellation of all festival programming. Ihnken subsequently brought this lawsuit, suing the county and many of its officials under a host of legal theories. The court previously granted summary judgment in favor of the county and its officials on most of those claims. (*See* Order, ECF No. 23; Order, ECF No. 46.) Still pending are Ihnken's claims that Frederick County Sheriff Charles Jenkins and Frederick County Zoning Administrator Larry Smith revoked the permit without due process of law, in violation of the Fourteenth Amendment of the United States Constitution and Article 24 of the Maryland Constitution. Jenkins and Smith now move to limit Ihnken's possible recovery to nominal damages. For the reasons explained below, that motion will be denied.

## ANALYSIS

"In order for a plaintiff who has suffered a deprivation of procedural due process to recover more than nominal damages, he must also prove that the procedural deprivation caused

some independent compensable harm." *Burt v. Abel*, 585 F.2d 613, 616 (4th Cir. 1978) (per curiam). Jenkins and Smith argue that revocation of the temporary land use permit authorizing Ihnken's festival would have been justified even if the county had employed a constitutionally adequate process to do so.[1] Ihnken's asserted damages, however, derive not simply from the alleged deprivation of process but from the substantive decision to revoke the permit, including lost profits and his tarnished reputation as a festival promoter. (*See* Mem. 7, ECF No. 45; Mot. In Limine Ex. HH, Interrog. Answers 1–2, 10–14, ECF No. 53-1.) Jenkins and Smith thus argue that "the failure to accord procedural due process could not properly be viewed as the cause of" Ihnken's losses unless adequate process would have generated a different substantive result. *Carey v. Piphus*, 435 U.S. 247, 260 (1978). Contending it would not, they claim Ihnken can recover no more than nominal damages as a matter of law.

Jenkins and Smith style their filing as a motion in limine, but that is not an accurate description. Rather than seek to exclude "a specific category of evidence," their motion "urges the Court to exclude a theory of damages," which is not the office of a motion in limine. *Imagexpo, LLC v. Microsoft Corp.*, 299 F. Supp. 2d 550, 551 (E.D. Va. 2003). "Unlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of fact, a motion *in limine* is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013) (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990)). "In light of their limited purpose, motions *in limine* 'should not be used to resolve factual disputes,' which remains the 'function of a motion for summary judgment, with its

---

[1] The court described the factual background of this case in resolving two previous motions, and will not do so again here. *See Ihnken v. Gardner*, 927 F. Supp. 2d 227, 231–34 (D. Md. 2013); (Mem. 1–7, ECF No. 45).

accompanying and crucial procedural safeguards.'" *Williams v. Johnson*, 747 F. Supp. 2d 10, 14 (D.D.C. 2010) (quoting *C & E Servs., Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008)).[2] Indeed, Jenkins and Smith incorporate by reference the exhibits appended to their prior motion for summary judgment. (*See* Mot. In Limine 4–5.) The court will apply the summary judgment standard here.

The procedural protections applicable to motions for summary judgment preclude, among other things granting judgment unless "the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). Under that standard, the court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football*

---

[2] For this reason, district courts "consistently disallow[] litigants to raise non-evidentiary matters in limine." *Louzon*, 718 F.3d at 562 (collecting decisions rendered by district courts in the Sixth Circuit). *C & E Services, Inc. v. Ashland Inc.*, for example, denied a motion in limine seeking to exclude certain evidence related to damages on the ground that plaintiffs could not establish any "causal connection between the damages claimed and any alleged act or omission by [the defendant]." 539 F. Supp. 2d at 322. Whether "an item of damages may not be recovered because no reasonable person could find that it was proximately caused by defendant's acts," the court reasoned, "is the function of a motion for summary judgment, with its accompanying procedural safeguards." *C & E Servs.*, 539 F. Supp. 2d at 323. This case is nearly identical: Jenkins and Smith argue that Ihnken is restricted to nominal damages because he cannot "prove that the procedural deprivation [of which he complains] caused some independent compensable harm." (Mot. 3, ECF No. 53 (quoting *Burt*, 585 F.2d at 616.) If anything, their arguments are even less suited to a motion in limine than those presented by the defendant in *C & E Services*. In that case, the defendant at least moved the court to preclude certain categories of evidence related to alleged damages. *See C & E Servs.*, 539 F. Supp. 2d at 322. Here, by contrast, resolution of the purported motion in limine "does not require any rulings relating to the admissibility of evidence at trial." *Louzon*, 718 F.3d at 562.

     Jenkins and Smith had the opportunity to contest Ihnken's legal entitlement to anything more than nominal damages via a motion brought under Federal Rule of Civil Procedure 56. They failed to do so, and the deadline for such a motion is long past. *See* Local Rule 105.2(a) ("All motions must be filed within deadlines set by the Court."); (Order Granting Motion to Modify Scheduling Order, ECF No. 35). If, after presenting their case to the jury, Jenkins and Smith continue to believe that Ihnken is restricted to nominal damages as a matter of law, then they may assert that argument via a motion brought under Federal Rule of Civil Procedure 50. For present purposes, however, their motion is denied on the basis of its procedural impropriety, as well as the substantive grounds described in the body of the memorandum.

*Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citation and internal quotation marks omitted).

Here, genuine issues of material fact remain unresolved as to the adequacy of the county's justifications for revoking Ihnken's permit. As noted in the court's previous memorandum on summary judgment, Smith decided to revoke the permit on the basis of the music played after 5:00 PM in violation of the permit conditions, the perceived violation of the alcohol ordinance, and safety concerns arising from the limited means of entering and exiting the event. (*See* Mot. Summ. J. Ex. C, Smith Aff. ¶ 13, 15, ECF No. 36-5.) Jenkins' decision to shut down the festival was premised on Ihnken's statement that he did not intend to end the music before 5:00 P.M. and the observed violation of the alcohol ordinance. (*See* Mot. Summ. J. Ex. EE, Jenkins Dep. 83:5–20, ECF No. 36–38.) Ihnken offers evidence calling into question each of those bases of action.

As to the purported violation of the permit by playing loud music after 5:00 PM, that conclusion was based on a potentially false premise: that the permit allowed music only between the hours of 8:00 AM and 5:00 PM. As this court has previously held, the permit "is ambiguous." *Ihnken*, 927 F. Supp. 2d at 232. The permit indicated that the festival would include "arts & crafts w[ith] music and demonstrations." (Mot. Summ. J. Ex. A, Permit 1, ECF NO. 36-3.) It provided that the festival would begin on June 18 at 8:00 AM and end on June 21 at 5:00 AM, suggesting the event would continue through the evenings and finally conclude early on the morning of morning of June 21. (*See* Permit 2.) Smith derives his contrary interpretation of that document from a column of text on pages four through seven of the permit, which is labelled "comments" and reads like an ongoing discussion about the event but which Smith characterizes as conditions on it. (*See* Permit 3–7; Smith Aff. ¶¶ 5–6; Mot. Summ. J. Ex.

D, Ridgell Aff. ¶¶ 6–7, ECF No. 36-6.) Specifically, that column states that Richard Ridgell of the Office of Life Safety found "[t]he plans ACCEPTABLE with the following provisional comment[]: . . . . The permit indicates that a Festival/ Arts & Crafts event with music and demonstrations will be held on June 18-21 between the hours of 8:00 a.m. and 5:00 p.m." (Permit 4.) A subsequent comment, however, notes that the festival would include overnight activity, specifically camping. (Permit 6.) That notation is inconsistent with the supposed "condition" on which Smith relies, but it is entirely compatible with the permit's representation that the festival would end early in the morning of June 21. It will be for a jury to sort through these seemingly contradictory signals.

Smith suggests that Frederick County's zoning ordinance authorized him to revoke the permit on the basis of use inconsistent with environmental standards, even if none of the permit's express conditions were violated. (*See* Mot. In Limine 5–6; Smith Aff. ¶¶ 7, 9.) That conclusion is legally dubious. Smith premises his interpretation of the zoning ordinance on a provision requiring the Zoning Administrator to determine "[b]efore issuing a permit" that "[t]he proposed activity is in compliance with all safety, heath, and environmental standards." Frederick Cnty., Md., Code of Ordinances § 1-19-8.700(A)(1). That provision is silent as to the consequences of the Zoning Administrator's mistaken issuance of a permit. Even when read against a separate provision authorizing the Zoning Administrator to revoke zoning certificates for "noncompliance with any conditions or requirements imposed under" the County's zoning ordinance, Frederick Cnty., Md., Code of Ordinances § 1-19-2.110(G), it does not appear to authorize revocation of an already issued permit on the basis of the Administrator's reconsideration of its initial decision.

In any case, the scope of the Administrator's legal authority need not be resolved here,

because the record contains a genuine dispute of fact as to whether the festival violated the "environmental standard" applicable to noise—the County's noise ordinance, which incorporates by reference (with some modifications not relevant here) Md. Code Regs. § 26.02.03.01–.03. *See* Frederick Cnty., Md., Code of Ordinances § 1-11-6. There is no dispute the music at the festival was loud, but it may not have exceeded the applicable noise limitations. *See* Md. Code Regs. § 26.02.03.02(B)(1). Although an incident report drafted by the commanding officer who responded to the festival on Thursday night indicates one officer had a "sound meter" on the scene, it does not reveal the decibel level that meter recorded. (*See* Mot. Summ. J. Ex. Y, Incident/Investigation Report 3, ECF No. 36-31.) And Smith reported that he was not personally "aware of any measurements taken with respect to the level of noise at the festival." (Mot. Summ. J. Ex. H, Smith Dep. 56:14–17, ECF No. 36-7.) According to Ihnken, sheriff's officers at the festival refused to reveal to him the reading of their sound meter, despite his request. (*See* Mot. Summ. J. Ex. E, Ihnken Dep. 138:16–20, ECF No. 36-7.) In any case, he had asked the technicians operating the festival's soundboard, which was equipped with a "constant decibel meter," for the festival "to keep it below halfway, which is way below the local ordinance." (*Id.* at 131:15, 23–24.) When Ihnken asked those technicians "if we were over [the limit] . . . they said no." (*Id.* at 138:16–17.)[3]

As to violation of the alcohol ordinance, Smith and Jenkins never verified alcohol sales. Smith explained in his affidavit that it is illegal to sell alcohol to the public in that part of Frederick County and that the festival had obtained no license or other exemption from the

---

[3] In his deposition, Sheriff Jenkins asserts that the noise ordinance prohibits all musical events after midnight, no matter how loud. (*See* Jenkins Dep. 60:2–6.) But Jenkins points to no specific provision in the noise ordinance establishing such a prohibition, and independent research yields none. Tellingly, Jenkins and Smith do not repeat that argument in their motion in limine.

Liquor Board to do so. (*See* Smith Aff. ¶ 12.) Despite the absence of permission to sell alcohol, Smith reports in his affidavit that he saw on the property "a beer truck . . . with beer *apparently* on tap" and that an individual there had described herself as a "bartender" to another county official. (Smith Aff. ¶ 12 (emphasis added).) At his deposition, however, Smith acknowledged that he did not know "if there was alcohol being served on site," did not know who, if anyone, was serving alcohol, and did not speak to anyone doing so. (Smith Dep. 51:20–52:1, 53:8–13.) Similarly, Jenkins acknowledged that he never spoke with the beer vendor and did not know if any county official had done so, although he did observe people bringing their own alcohol to the site. (*See* Jenkins Dep. 67:1–7, 68:22–69:4.) Although Ihnken concedes that at least one individual probably sold beer at the festival, he never personally witnessed any such sales and the putative beer vendor showed Ihnken his permit to do so and had been referred to Ihnken by the Liquor Board. (*See* Ihnken Dep. 76:6–77:10, 77:13–24.) In any case, Jenkins noted that any alcohol-related violation would be remedied via citation, with the opportunity for a hearing before the Liquor Board. (*See* Jenkins Dep. 83:22–84:4.) And although the defendants assert that the permit was conditioned on *not* selling alcohol, (*see* Mot. In Limine 6), the document itself is entirely silent on that supposed condition.[4]

     As to Smith's safety concerns, they were based on the existence of "only one narrow driveway up onto the property where I was informed hundreds of people were camping." (Smith Aff. ¶ 13.) In his deposition, Smith premised that concern not only on the number of campers, but also on the total number of festival participants, which he had heard was "going to be over 1,000, 1,200 or more persons." (Smith Dep. 49:9–16.) But Smith acknowledged that he did not

---

[4] It is true that the permit *application* omitted any reference to alcohol sales. Indeed, it failed to answer the question posed on the Use Permit Worksheet, "Will there be . . . alcohol?" (Application 1) The permit itself, however, was not expressly conditioned on the absence of alcohol.

know how many people were present on the property and did not count the number of people there. (*See* Smith Dep. 48:12–16.) Indeed, no evidence in the record indicates that he or any other county official verified whether attendance at any one time would exceed the maximum allowed under the permit. Ihnken estimated the total number of people at the festival on Friday morning to be roughly 400 to 450 individuals, many of whom would stay for only one night and would not be permitted to re-enter after leaving the festival. (Ihnken Dep. 179:1–2, 6–20.) And Smith had already approved the permit on the understanding that only one exit and entrance to the site would be available to participants. (*See* Mot. Summ. J. Ex. G, Permit Application 4, ECF No. 36-12.)

In their motion in limine, Smith and Jenkins also assert that the permit would have been revoked for failure to comply with permitting requirements, imposed by the State of Maryland, for outdoor music festivals. *See* Md. Code Ann., Bus. Reg. § 17-1403; *see also* Md. Code Regs. §§ 10.16.05.01–.16. That requirement only applies, however, to festivals "with 500 or more spectators in attendance." Md. Code Regs. § 10.16.05.01(C)(2)(b). As noted, nothing in the record reliably indicates how many individuals were at the festival at any one time. Moreover, county officials evaluated whether the festival needed to comply with the permitting requirements for an outdoor music festival, decided that it did not, and communicated that conclusion to Ihnken. (*See* Mot. Summ. J. Ex. P, Email from George Keller to Dale Ihnken, June 2, 2009, ECF No. 36-22; *see also* Mot. Summ. J. Ex. O, Email from Barbara Brookmyer to George Keller, June 2, 2009, ECF No. 36-21.) The county premised that decision, in part, on a press release for the event that Ihnken provided to them. (Email from Keller to Ihnken; Email from Brookmyer to Keller.) Jenkins and Smith now characterize that press release as

misleading, insofar as it suggested "that the music element was a minor part of the Festival." (Mot. In Limine 7.) A jury, however, might well disagree. The press release named several musical acts scheduled to perform during the festival, including Conspirator, Skream, Benga, Haj, the Rhythm Shamans, and Shpongle. (*See* Mot. Summ. J. Ex. O, Email from Dale Ihnken to George Keller, June 2, 2009, ECF No. 36-21.) Although the press release did not identify most of those performers as musicians per se, it contains many references to music; it described the festival—which included images produced by visual artist Alex Grey, the headliner—as "a multimedia collaboration" and "an intermedia audio-visual collaboration," emphasizing "the jam-electo [sic] contemporary genre," "musical support provided by Haj . . . and the Rhythm Shamans," "a Shpongle dj set," and other "DJ sets" with unnamed performers. (Email from Ihnken to Keller.) Those repeated references to music were consistent with the original application for the permit, which expressly states that the "type of entertainment" available at the festival would be "music & demonstrations." (Permit Application 1.)

Given the existence of outstanding questions of material fact as the purported justifications for revoking the permit, the court will not limit Ihnken to nominal damages.

## CONCLUSION

As noted above, Jenkins' and Smith's motion in limine is procedurally improper and is premised on the resolution of factual questions that the jury alone can answer. For the reasons stated above, the defendants' motion in limine will be denied.

A separate order follows.

February 11, 2015                                            /S/
Date                                                       Catherine C. Blake
                                                             United States District Judge